Filed 6/7/13  In re A.P. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.P. et al., Persons Coming Under the Juvenile Court Law. | |
| | D063141 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3605A-B) |
| v. | |
| BRITTANY H., | |
| Defendant and Appellant. | |

APPEAL from judgments of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Joanne D. Willis Newton, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Brittany H. appeals judgments declaring her minor daughters, A.P. and Danielle P., dependents of the juvenile court and removing A.P. from her custody. Brittany challenges the sufficiency of the evidence to support the court's jurisdictional findings as to both minors and its dispositional order as to A.P. We affirm the judgments.

FACTUAL AND PROCEDURAL BACKGROUND

In September 2012, the San Diego County Health and Human Services Agency (Agency) received a child abuse referral regarding 14-year-old A.P., who is deaf and has autistic features. Despite her language and communication limitations, A.P. described an incident that occurred on September 8, during which Brittany grabbed her face, hit her and pushed her to the ground. A.P. admitted she kicked Brittany in the face. A.P. had a bruise on her arm that she claimed was caused by Brittany grabbing her. She said Brittany was drunk all the time and unable to help her with homework.

The social worker separately interviewed 13-year-old Danielle, who denied that Brittany abused alcohol. Danielle witnessed the September 8 altercation, describing how A.P. attacked Brittany, and how Brittany tried to stop A.P. by grabbing her arms and pushing her down to the floor. Danielle said A.P. kicked Brittany in the eye, causing bruising.

Brittany denied having a problem with alcohol. She said A.P.'s behavior had been out of control for several years. A.P. had been referred to counseling at Deaf Community

2

Services and at the National Center for Deaf Advocacy, but Brittany had not followed through because she was too busy caring for her youngest child, Brayden A. Brittany described an incident when two-year-old Brayden touched A.P.'s computer, causing A.P. to get upset and shove him. A.P. hit the maternal aunt when she tried to intervene, and then hit and kicked Brittany. They fell to the ground and A.P. kicked Brittany in the eye. On another occasion, A.P. became physically aggressive toward Brittany and Danielle when Brittany asked A.P. to clean her room. A.P. chased Brittany with a knife. Brittany said she did not sleep well and was constantly worried about her safety and the safety of other family members. Brayden was currently living with his father because of the unsafe environment in the home.

Brittany described another incident when A.P. became upset, grabbed a knife and threatened to cut her with it. Brittany called the police because A.P.'s behavior continued to escalate. The police arrived with a psychiatric assessment team that determined A.P. needed to be placed on a 72-hour hold at a psychiatric hospital because she was a danger to herself or others. The police found a sign on the refrigerator that said "KILL MOM." The next morning, staff at the psychiatric hospital reported A.P. had calmed down and would be released. Brittany stated she believed Danielle and Brayden were not safe as a result of A.P.'s behaviors. She had several video recordings of A.P.'s out-of-control behaviors, taken by Danielle at Brittany's request, showing A.P. screaming, throwing objects and trying to hit people. In one video, A.P. was swinging a souvenir baseball bat at Brittany, nearly hitting her in the face.

3

In October 2012, police responded to an incident of domestic violence between Brittany and her former live-in boyfriend, Michael L., which Danielle witnessed. Michael said Brittany had been drinking the majority of the day prior to the incident. She began yelling at him, then hit and shoved him. She pushed him into the garage door, causing him to cut his ear. Brittany was arrested. Danielle denied having seen other incidents of domestic violence between Brittany and Michael, but said Michael punched the walls in the house and one time put his head through the wall when he got drunk and angry. This behavior frightened Danielle.

The social worker contacted A.P.'s teacher, who reported that A.P. expressed concern to her about Brittany's drinking and abusive behavior. The teacher was concerned about Brittany's lack of involvement in A.P.'s education. A meeting was scheduled regarding A.P.'s Individualized Education Plan (IEP), but Brittany failed to attend or call to cancel. Brittany also failed to sign A.P.'s weekly reading logs, which resulted in A.P. receiving detention. School staff left telephone messages for Brittany, but she did not return their calls.

On October 10, Agency filed a petition in the juvenile court as to A.P. under Welfare and Institutions Code section 300, subdivision (c)[1] alleging she was suffering, or was at substantial risk of suffering, serious emotional damage evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior toward herself or others as a result of the conduct of the parent, and she required mental health treatment, which

---

[1] Statutory references are to the Welfare and Institutions Code.

4

Brittany had failed or been unable to provide. Agency also filed a petition as to Danielle under section 300, subdivision (b), alleging she was at substantial risk of serious physical harm because she was periodically exposed to violent confrontations in the family home between Brittany and A.P. As to both A.P. and Danielle, the petitions also alleged they were at substantial risk of harm because Brittany abused alcohol (§ 300, subd. (b)). A.P. was taken into protective custody.

At a detention hearing, the court found A.P.'s out-of-home detention was necessary due to a substantial danger to her physical health and because there were no reasonable means to protect her without removal. The court detained Danielle with Brittany and ordered supervised visits between Brittany and A.P.

Social worker Lynette Miller met with Brittany in her home in the presence of her attorney, but Brittany refused to discuss the allegations that led to Agency's involvement. She had recently tested positive for marijuana. Brittany reported drinking alcohol once a week and smoking marijuana two to three times a week to help with the pain in her arms. On the advice of counsel, she had not smoked marijuana since the last court hearing. Brittany claimed she had signed A.P.'s reading logs and her IEP. When asked why the school had not received these materials, she blamed A.P. Brittany recently began attending Alcoholics Anonymous meetings and said she was participating in domestic violence services.

According to Jane Arena, the social worker from Agency's deaf services unit who investigated a child abuse referral in December 2011, A.P. reported Brittany drank all the time, hit her with a belt, pinned her down on the bed and choked her. A.P. responded by

5

kicking Brittany. Brittany told Arena that A.P. had been violent toward Danielle and Brayden.

Miller recommended the court declare A.P. and Danielle dependents, noting Brittany struggled with alcohol abuse and had been unable to adequately address A.P.'s aggressive behaviors and keep the family safe. Since December 2011, A.P. repeatedly threatened to kill Brittany. Although Brittany previously had been provided with referrals to services, she had not consistently followed through with them.

A.P. had been assessed by the San Diego Regional Center (Regional Center) in 2006, but was deemed ineligible for services at that time. As of November 2012, A.P. had minimal language skills because she used American Sign Language (ASL) only at school. None of her family members were sufficiently fluent in ASL to maintain an intimate or lengthy conversation with her. Because A.P. presented with autistic features, she needed to be reevaluated by the Regional Center or a developmental specialist.

A.P. was living with the maternal aunt and had adjusted well to her placement there, but told the social worker she wanted to go home. A.P.'s psychiatrist, Dr. Paul Olenski, had prescribed Risperdal for her. The medication caused A.P. to feel drowsy and fall asleep at school.

A.P., the maternal aunt and Miller attended an appointment with Dr. Olenski on November 8, 2012. A.P. had been Dr. Olenski's patient since 2004, and he had been prescribing medication for her since 2005. He never used an ASL interpreter during sessions with A.P., but instead relied on feedback from Brittany. He did not know Brittany was not fluent in ASL. Dr. Olenski had been treating A.P. for agitation and

disruptive behavior. His last contact with Brittany was six months earlier. He was unaware of the aggressive behaviors A.P. had been exhibiting in the home since December 2011. Dr. Olenski had prescribed several different medications for A.P. before prescribing Risperdal. He knew A.P. exhibited maladaptive behaviors and considered the possibility she might have Asperger's syndrome, which was on the autism spectrum. Because A.P. complained of headaches and dizziness, Dr. Olenski recommended she discontinue taking Risperdal, noting her dosage was too high. Brittany disagreed with Miller's recommendation to change psychiatrists for A.P.

Brittany requested a meeting at school to discuss A.P.'s IEP goals, but then did not attend. A.P., the maternal aunt and Miller were present. When school officials telephoned Brittany, she said she was not feeling well. Several days later, Brittany's counsel informed Miller that Brittany had signed the IEP and had provided it to the school.

The relationship between Brittany and the maternal aunt began to deteriorate and, consequently, Miller arranged for Brittany to have supervised visits with A.P. at a neutral location. Because of harassment the maternal aunt received from Brittany and other family members, she could not continue caring for A.P. Miller intended to look for a new placement for A.P. where the caregivers were fluent in ASL and were able to provide behavior modification and intervention in a structured environment.

At a contested jurisdiction and disposition hearing, Miller testified she had arranged for A.P. to receive therapeutic in-home services, and she had also arranged for her to receive individual therapy. During one of A.P.'s sessions with Dr. Olenski, Miller

7

discussed the importance of using an ASL interpreter in future sessions, but Dr. Olenski had no response. When A.P. discontinued taking Risperdal on Dr. Olenski's orders, her behavior worsened. Miller recommended a change in psychiatrists for A.P. In Miller's opinion, it was unprofessional for Dr. Olenski to treat A.P. without an ASL interpreter because it showed he was not sensitive to her language and cultural needs. Also, Dr. Olenski did not have sufficient information from Brittany to make an accurate assessment and diagnosis of A.P. His lack of contact with A.P. for six months was too long a period for a child taking prescription medication.

Danielle testified that she felt safe at home. She believed A.P. should be able to return home as well.

After considering the evidence and arguments of counsel, the court dismissed the counts under section 300, subdivision (b) that alleged Brittany was unable to provide regular care for A.P. and Danielle because of alcohol abuse. The court sustained the other allegations of the petitions and declared A.P. and Danielle dependents. The court removed A.P. from Brittany's custody under section 361, subdivision (c)(3) and placed her in out-of-home care. The court placed Danielle with Brittany.

DISCUSSION

I

Brittany contends the court's jurisdictional findings under section 300, subdivisions (b) and (c) were not supported by substantial evidence. She asserts: (1) there was no evidence A.P. was suffering, or was at risk of suffering, serious emotional damage as a result of Brittany's conduct; and (2) there was no evidence Danielle was

8

exposed to confrontations between A.P. and Brittany or that Brittany failed to protect Danielle during A.P.'s outbursts.

A

*Standard of Review*

In reviewing the sufficiency of the evidence on appeal, we consider the entire record to determine whether substantial evidence supports the juvenile court's findings. Evidence is "substantial" if it is reasonable, credible and of solid value. (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.) We do not pass on the credibility of witnesses, resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if other evidence supports a contrary finding. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Juvenile dependency proceedings are intended to protect children who are currently being abused or neglected, "and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) "The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843; *In*

*re Heather A.* (1996) 52 Cal.App.4th 183, 194-196.)  The focus of section 300 is on averting harm to the child.  (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 536.)

Although "the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm" (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824), the court may nevertheless consider past events when determining whether a child presently needs the juvenile court's protection.  (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1135; *In re Troy D.* (1989) 215 Cal.App.3d 889, 899-900.)  A parent's past conduct is a good predictor of future behavior.  (*In re Petra B.* (1989) 216 Cal.App.3d 1163, 1169-1170.)  "Facts supporting allegations that a child is one described by section 300 are cumulative."  (*In re Hadley B.* (2007) 148 Cal.App.4th 1041, 1050.)  Thus, the court "must consider all the circumstances affecting the child, wherever they occur."  (*Id*. at pp. 1048, 1049.)

B

*Jurisdictional Findings as to A.P.*

Section 300, subdivision (c) provides a basis for juvenile court jurisdiction if "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care. . . ."  Under this provision, juvenile court intervention is appropriate when:  (1) Agency can show parental fault, which caused the emotional harm; or (2) the child is suffering serious emotional damage through no fault of the parent, but the parent is

10

unable to provide appropriate care. (*In re Shelley J.* (1998) 68 Cal.App.4th 322, 329, 330 [court properly assumed jurisdiction under section 300, subdivision (c), where minor was suffering serious emotional damage but had no parent capable of providing appropriate care]; cf. *In re Alexander K.* (1993) 14 Cal.App.4th 549, 557 [jurisdictional findings under section 300, subdivision (c), reversed where petition alleged offending parental conduct that resulted in minor's serious emotional damage but evidence did not support a finding of parental fault].) Only where parental fault is involved must Agency further prove there was offending parental conduct which caused the serious emotional harm. (*In re Alexander K.*, at p. 557.)

Here, the evidence was undisputed that A.P. is suffering serious emotional damage as shown by her assaultive and threatening behavior. (Cf. *In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379-1383 [there was insufficient evidence of severe emotional harm where child was in middle of bitter and extended custody battle between parents and child had no real symptoms of severe emotional problems at time of jurisdiction hearing].) Agency was not required to show Brittany's conduct *caused* A.P.'s emotional damage because the petition alleged, and the evidence showed, Brittany was incapable of providing A.P. with appropriate care to address her serious emotional issues within the meaning of section 300, subdivision (c).

Brittany admitted A.P.'s behavior had been out of control for several years and there had been many physical confrontations between Brittany and A.P. Brittany feared for her own safety and that of her other children. Before the dependency petitions were filed, Brittany had received several referrals for counseling for A.P., but she did not

11

follow through with these services. Consequently, A.P.'s violent tendencies escalated, resulting in the September 8 incident during which Brittany grabbed A.P.'s face, hit her and pushed her to the ground, followed by A.P. kicking Brittany in the face. Brittany's conduct in trying to physically restrain A.P., coupled with her inaction in seeking appropriate help, showed she was not capable of addressing A.P.'s serious emotional damage.

Moreover, Brittany was unwilling or unable to fully participate in A.P.'s educational planning, medication adjustments and progress in services. Although A.P. had been under the care of Dr. Olenski for eight years, he had never used an ASL interpreter during his sessions with her. Instead, he relied on feedback from Brittany to treat A.P. and prescribe medication for her. Dr. Olenski did not know about A.P.'s aggressive behaviors at home because Brittany withheld significant information from him, including failing to tell him that A.P. chased her with a knife, attacked her with a baseball bat, repeatedly threatened to kill her and was violent toward Danielle, Brayden and the maternal aunt. Although the family was in crisis, Brittany did not take A.P. to see Dr. Olenski for six months. Despite a decline in A.P.'s emotional well-being, Brittany refused to authorize a change in psychiatrists for her. Under these circumstances, the court could reasonably find Brittany was unable to provide the type of

mental health treatment that would keep A.P. and the entire family safe, requiring juvenile court intervention. (§ 300, subd. (c).)[2]

C

*Jurisdictional Findings as to Danielle*

Section 300, subdivision (b) provides a basis for juvenile court jurisdiction if the child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness as a result of the parent's failure to adequately supervise or protect the child or provide adequate medical treatment. As we previously discussed, the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. (*In re Heather A.*, *supra*, 52 Cal.App.4th at pp. 194-196.)

Here, the evidence showed Danielle was at substantial risk of serious physical harm because she was periodically exposed to the violent confrontations between Brittany and A.P. For example, Brittany hit, grabbed and shoved A.P., and A.P. kicked Brittany, tried to hit her in the face with a baseball bat, chased her with a knife, and on

---

2    Brittany argues she had a pattern of seeking outside help to address A.P.'s behavioral and emotional problems. However, the problems in this home were ongoing and A.P.'s behaviors were getting increasingly grave and violent. Although Brittany may have engaged in some crisis intervention, she did not provide adequate mental health treatment for A.P.

more than one occasion threatened to kill her.[3] Exposing children to recurring violence in the home impacts them even if they are not the ones being physically abused "because they see and hear the violence and the screaming." (*In re Heather A.*, *supra*, 52 Cal.App.4th at p. 192; *In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 [physical violence can support jurisdictional finding where violence is ongoing or likely to continue, and places child at risk of physical harm].) The cycle of violence between Brittany and A.P. constituted a failure to protect Danielle "from the substantial risk of encountering the violence and suffering serious physical harm or illness from it." (*In re Heather A.*, at p. 194; see also *In re Sylvia R.* (1997) 55 Cal.App.4th 559, 562 [children suffer secondary abuse from witnessing violent confrontations].)

Danielle not only observed the physical violence between her mother and sister on numerous occasions, but was also injured when A.P. punched her and struck her in the face with the zipper or metal button on a pair of jeans. Brittany was unable to get appropriate help for A.P., showing the violence was likely to continue and placing Danielle at continuing risk of physical harm. Substantial evidence supports the court's jurisdictional finding as to Danielle under section 300, subdivision (b).

II

Brittany challenges the sufficiency of the evidence to support the dispositional order as to A.P. She contends substantial evidence did not support the court's findings:

---

3      Although Brittany characterizes these confrontations as "trying to control and restrain" A.P., the risk to Danielle was still the same, regardless of who was the aggressor.

(1) there were no reasonable means by which A.P.'s health could be protected without removing her from Brittany's custody; and (2) reasonable efforts were made to prevent or eliminate the need for A.P.'s removal.

A

*Removal Under Section 361, Subdivision (c)(3)*

Before the court may order a child physically removed from his or her parent's custody under section 361, subdivision (c)(3), it must find, by clear and convincing evidence, "[t]he minor is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others, and there are no reasonable means by which the minor's emotional health may be protected without removing the minor from the physical custody of his or her parent . . . ."  The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home.  (§ 361, subd. (c)(1); *In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)  A removal order is proper if based on parental inability to provide adequate care for a child and proof of a potential detriment if the child remains with the parent.  (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 969.)  The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  (*In re Diamond H., supra*, 82 Cal.App.4th at p. 1136.)  We review the court's dispositional findings for substantial evidence.  (*In re Lana S.* (2012) 207 Cal.App.4th 94, 105; *In re N.M.* (2011) 197 Cal.App.4th 159, 170.)

15

B

*Removal of A.P. Was Appropriate*

Here, the court removed A.P. from Brittany's custody because the evidence showed A.P. was suffering serious emotional damage and Brittany was unable to provide appropriate care for her. For several years, A.P. had been physically violent toward Brittany and other family members and repeatedly threatened to kill Brittany. Brittany's efforts to control this behavior were unavailing. Although Brittany argues the court could have allowed A.P. to remain in the home with services in place, ample evidence supported a finding there were no reasonable means to protect A.P.'s physical and emotional health without removing her from Brittany's custody.

C

*Reasonable Efforts Were Made to Prevent the Need for Removal*

Brittany asserts Agency made no efforts to prevent or eliminate the need to remove A.P. from her custody. However, the evidence showed Brittany previously received several referrals for counseling for A.P. When Brittany did not follow through with obtaining necessary services and was not forthcoming with Dr. Olenski, A.P.'s violent behaviors increased and her emotional state declined. The services Brittany initiated for A.P., including treatment by Dr. Olenski, failed to eliminate or mitigate the protective issues. Thus, the court properly found reasonable efforts were made to prevent or eliminate the need for removal. (§ 361, subd. (d).)

16

## DISPOSITION

The judgments are affirmed.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

McINTYRE, J.